# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| VICTOR MEJIA RIOS, individually; W.D.M.R., individually and by and through his Parent, VICTOR MEJIA RIOS; JORGE LUIS MARTINEZ MARTINEZ, individually; J.L.M.F., individually and by and through his Parent, JORGE LUIS MARTINEZ MARTINEZ; TOMAS ANTONIO OLIVEROS, individually; A.R.O., individually and by and through his Parent, TOMAS ANTONIO OLIVEROS; WILDER XITUMUL GARCIA, individually; A.M.X.C., individually and by and through his Parent, WILDER XITUMUL GARCIA; PEDRO CARRILLO JIMENEZ, individually; M.C.J., individually and by and through his Parent, PEDRO CARRILLO JIMENEZ; NELSON CAZALEGNO PAZ, individually; O.J.C.S., individually and by and through his Parent, NELSON CAZALEGNO PAZ; JOSE PINEDA RIVERA, individually; J.M.P.A., individually and by and through his Parent, JOSE PINEDA RIVERA; WILSON PINEDA GONZALES, individually; W.E.P.S., individually and by and through his Parent, WILSON PINEDA GONZALES; NOE WALTER PEREZ GONSALEZ, individually; G.L.P.G., individually and by and through his Parent, NOE WALTER PEREZ GONSALEZ; MARVIN REYES PORTILLO, individually; M.R.R.R., individually and by and through his Parent, MARVIN REYES PORTILLO; RUBIER NATO DE OLIVEIRA, individually; G.H.D.O., individually and by and through his Parent, RUBIER NATO DE OLIVEIRA; OBDULIO VASQUEZ PUAC, individually; T.P.C., individually and by and through his Parent, OBDULIO VASQUEZ PUAC; ELMER VELIZ RIVERA, individually; E.Y.V.B., individually and by and through his Parent, ELMER VELIZ RIVERA;<br><br>Plaintiffs, | CIVIL ACTION NO. 19-552<br><br><br>COMPLAINT<br>DEMAND FOR JURY TRIAL |

v.

THE GEO GROUP, INC.,

      Defendant.

## COMPLAINT

COME NOW, Plaintiffs, by and through their attorneys of record, and for their Complaint against Defendant The GEO Group, Inc. ("GEO"), state:

### GENERAL ALLEGATIONS

1.     Plaintiffs are thirteen asylum-seeking CHILDREN and their thirteen asylum-seeking FATHERS who fled persecution and violence threatening their well-being or lives in their home countries to seek protection in the United States. Pursuant to the federal government's "zero tolerance policy," Plaintiff FATHERS were forcibly separated from their respective sons after they entered the United States. In implementing such policy the federal government relied on companies, such as Defendant The GEO Group, Inc. ("GEO"), to manage and operate detention centers where Plaintiffs would be held indefinitely pending resolution of their claims for protection. Plaintiffs' claims arise from GEO's intentional misconduct and mistreatment of them while GEO detained them at the Karnes County Residential Center (the "Karnes Detention Center") in Karnes City, Texas, and/or the South Texas Detention Complex (the "Pearsall Detention Center") in Pearsall, Texas.

2.     On June 26, 2018, the United States District Court for the Southern District of California issued a nationwide preliminary injunction (the "Preliminary Injunction") prohibiting the Immigration and Customs Enforcement ("ICE"), the Department of Homeland Security ("DHS"), United States Customs and Border Patrol ("CBP"), their officers and agents, and those

participating with them from detaining those parent class members in "[Department of Homeland Security] custody without and apart from their minor children." *Ms. L v. I.C.E., et al.*[1] That court found that family separation severely harms children and parents alike.[2] Pursuant to the Preliminary Injunction, parent class members were to be reunited with their minor children who were (i) under the age of five within fourteen (14) days, and (ii) age five (5) and above within thirty (30) days.[3] Plaintiffs in this case, all of whom were covered by the Preliminary Injunction, were reunited and subsequently detained at the Karnes Detention Center.

3.      Upon information and belief, with no prior notice, in direct violation of the Preliminary Injunction and with callous indifference toward Plaintiffs' rights, on August 15, 2018, GEO re-separated Plaintiff children from their Plaintiff FATHERS without a lawful justification (the "08/15/2018 Re-separation"), in violation of the court-ordered reunification, and in violation of the constitutional rights of the FATHERS and their CHILDREN. GEO directed, arranged, participated, and/or permitted scores of armed men to forcibly apprehend Plaintiff FATHERS, handcuff them, and remove them from the Karnes Detention Center by using excessive force and carrying gear including bulletproof vests, shields, kneepads, boots, helmets, tear gas equipment, and guns. When removing the FATHERS, officers pointed their rifles and pistols at them and/or made statements unnecessarily causing them to fear for their lives. GEO then removed the FATHERS without their CHILDREN from the Karnes Detention Center, loaded them onto a bus, and transported them with all of their belongings to the Pearsall Detention Center, nearly two hours away. GEO refused to inform the FATHERS where they were being taken, why GEO was again separating them from their CHILDREN, whether the

---

[1] 310 F.Supp.3d 1133, 1149 (S.D.Cal. 2018).
[2] *Id.*
[3] *Id.* at 1149.

CHILDREN would remain at the Karnes Detention Center or anywhere in the United States, whether their children were safe, and who would care for them. GEO's staff also told the FATHERS that they would be deported without their children, that their children would be adopted by families living in the United States, and that they would never again see their children.

4.      Upon information and belief, Plaintiff FATHERS cried while GEO removed the FATHERS with all their belongings from the Karnes Detention Center and transferred them to the Pearsall Detention Center. GEO's actions caused the FATHERS to suffer great mental distress, trauma, and anguish. Once they arrived at the Pearsall Detention Center GEO removed the FATHERS from the bus; formally processed them through intake procedures at the Pearsall Detention Center; and gave the FATHERS handbooks and rules for the Pearsall Detention Center, uniforms, and identification bracelets. GEO's actions caused the FATHERS to reasonably believe that they would be indefinitely detained there alone and that they would never see their children again.

5.      Upon information and belief, while GEO removed Plaintiff FATHERS from the Karnes Detention Center, GEO told Plaintiff children (who were as young as six years old) that they were going to be separated again from their FATHERS permanently. GEO told the Plaintiff children that their Plaintiff FATHERS would never return to the Karnes Detention Center and mocked the Plaintiff children by saying, among other things, "Don't worry, your fathers are in jail."

6.      Upon information and belief, for an unjust number of hours following the 08/15/2018 Re-separation, Plaintiff CHILDREN had no idea where their FATHERS were, Plaintiff FATHERS had no idea where their CHILDREN were, and GEO intentionally refused to

respond to Plaintiffs' inquiries about the location, safety, and well-being of their loved ones. In fact, GEO laughed at and ridiculed both the FATHERS and the CHILDREN, making fun of their dire circumstances and exacerbating the extreme distress caused by the re-separation from their loved ones. GEO's deliberate actions traumatized Plaintiff FATHERS and CHILDREN and intentionally subjected them to severe and continuing emotional distress, psychological trauma, and mental anguish. GEO's actions also violated Plaintiff FATHERS' statutory rights under Texas law to possession of and access to their CHILDREN.

## PARTIES

7.      Plaintiff FATHERS and their minor CHILDREN are noncitizens seeking asylum in the United States who were detained at the Karnes Detention Center.

8.      Plaintiff Elmer Veliz Rivera and his son Plaintiff E.Y.V.B. and Plaintiff Obdulio Vasquez Puac and his son T.P.C. requested to return back to their country of citizenship. All other plaintiffs in this case are awaiting a determination of their asylum applications.

9.      Plaintiff Victor Mejia Rios ("MEJIA") is an adult and the father of Plaintiff W.D.M.R., a minor of six (6) years of age at the time of the re-separation. They are both citizens of Honduras.

10.     Plaintiff Jorge Luis Martinez Martinez ("MARTINEZ") is an adult and the father of Plaintiff J.L.M.F., a minor of eight (8) years of age at the time of the re-separation. They are both citizens of Honduras.

11.     Plaintiff Tomas Antonio Oliveros ("OLIVEROS") is an adult and the father of Plaintiff A.R.O., a minor of twelve (12) years of age at the time of the re-separation. They are both citizens of Guatemala.

12.     Plaintiff Wilder Xitumul Garcia ("GARCIA") is an adult and the father of

Plaintiff A.M.X.C., a minor of seven (7) years of age at the time of the re-separation. They are both citizens of Guatemala.

13.     Plaintiff Pedro Carrillo Jimenez ("CARRILLO") is an adult and the father of Plaintiff M.C.J., a minor of fourteen (14) years of age at the time of the re-separation. They are both citizens of Guatemala.

14.     Plaintiff Nelson Cazalegno Paz ("PAZ") is an adult and the father of Plaintiff O.J.C.S., a minor of nine (9) years of age at the time of the re-separation. They are both citizens of Honduras.

15.     Plaintiff Jose Pineda Rivera ("PINEDA") is an adult and the father of Plaintiff J.M.P.A., a minor of seventeen (17) years of age at the time of the re-separation. They are both citizens of Honduras.

16.     Plaintiff Wilson Pineda Gonzales ("GONZALES") is an adult and the father of Plaintiff W.E.P.S., a minor of fourteen (14) years of age at the time of the re-separation. They are both citizens of Honduras.

17.     Plaintiff Noe Walter Perez Gonsalez ("PEREZ") is an adult and the father of Plaintiff G.L.P.G., a minor of eight (8) years of age at the time of the re-separation. They are both citizens of Guatemala.

18.     Plaintiff Marvin Reyes Portillo ("REYES") is an adult and the father of Plaintiff M.R.R.R., a minor of fourteen (14) years of age at the time of the re-separation. They are both citizens of Honduras.

19.     Plaintiff Rubier Nato De Oliveira ("NATO") is an adult and the father of Plaintiff G.H.D.O., a minor of seventeen (17) years of age at the time of the re-separation. They are both citizens of Brazil.

20.     The adult FATHERS, *i.e.*, RIVERA, PUAC, MEJIA, MARTINEZ, OLIVEROS, GARCIA, CARRILLO, PAZ, PINEDA, GONZALES, PEREZ, REYES, and NATO, are collectively referred to as the "FATHERS." The minor CHILDREN, *i.e.*, E.Y.V.B., T.P.C., W.D.M.R., J.L.M.F., A.R.O., A.M.X.C., M.C.J., O.J.C.S., J.M.P.A., W.E.P.S., G.L.P.G., M.R.R.R., and G.H.D.O., are collectively referred to as the "CHILDREN."

21.     GEO is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida and doing business throughout Texas. GEO is a multi-billion-dollar corporation that owns, leases, and operates more than 130 correctional and detention facilities with more than 96,000 beds worldwide.  In February 2019 GEO employed approximately 22,000 people and had a market capitalization over $2.8 billion. GEO owns and operates the Karnes Detention Center and the Pearsall Detention Center.

## JURISDICTION AND VENUE

22.     This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. §1332(a). GEO is not a citizen of the same state as any Plaintiff, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

23.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b).

## THE ZERO TOLERANCE POLICY SEPARATING FAMILIES AND THE ORDER REQUIRING THEIR REUNIFICATION

24.     On May 7, 2018, then-Attorney General Jeff Sessions announced a "zero tolerance policy" under which all adult migrants entering the country without inspection would be referred for criminal prosecution. As a result of this policy children traveling with a parent were separated from their parent and transferred to the care and custody of Health & Human

Services. Under this policy each of the FATHERS and CHILDREN were separated from one another for several weeks or months.

25.     On June 26, 2018, in a federal action entitled *Ms. L v. I.C.E., et al.*, filed in the United States District Court for the Southern District of California, Case No. 18CV0428 DSM MDD, that court ruled that the plaintiff class[4] stated a claim for violation of their Fifth Amendment due process rights to family integrity based on the government's separation of them from their minor children.[5] In holding that the "allegations call sharply into question the separations of Plaintiffs from their minor children," the court emphasized the psychological and emotional trauma suffered by the minor children from the separations.[6] The court added that the plaintiffs' allegations "describe government conduct that arbitrarily tears at the sacred bond between parent and child," that "is brutal, offensive, and fails to comport with traditional notions of fair play and decency," and that "'shocks the conscience' and violates Plaintiffs' constitutional right to family integrity."[7]

26.     On June 20, 2018, following widespread outrage over this policy and the separation of migrant children from their parents, President Trump signed an Executive Order that required that migrant families be kept together during criminal and immigration proceedings to the extent permitted by law. On June 26, 2018, the court in *Ms. L* issued the nationwide Preliminary Injunction prohibiting the federal government from separating the parent class

---

[4] On June 23, 2018, that court issued an Order certifying the following class: "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by  DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that  the  parent is unfit or presents a danger to the child."
[5] 302 F.Supp.3d 1149, 1165-1166 (S.D.Cal. 2018).
[6] *Id* at. 1166.
[7] *Id*. at 1167.

members from their children.[8] The court found that plaintiffs showed a likelihood of succeeding on the merits on their due process claim. It reasoned that the plaintiffs were subjected to "family separation without a determination that the parent was unfit or presented a danger to the child."[9] The court also found the plaintiffs had demonstrated irreparable harm from the separations, noting that other courts have repeatedly found that the separation of a parent from his or her child constitutes irreparable harm. Just as the court concluded that separations harmed parents, it likewise concluded that the separations similarly harm children and relied on evidence that "separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development."[10] The court emphasized evidence that "[s]eparation from family leaves children more vulnerable to exploitation and abuse, no matter what the care setting. In addition, traumatic separation from parents creates toxic stress in children and adolescents that can profoundly impact their development."[11] As a result, absent a determination that a parent is unfit or presents a danger to the child or a decision by a parent to decline to be reunited with the child, the court enjoined ICE, DHS, CBP, and the other defendants "from detaining the Class Members in [the Department of Homeland Security] custody without and apart from their minor children."[12] Pursuant to the Preliminary Injunction, the federal government and its agents could no longer separate these immigrant families and, absent *very limited* circumstances, were specifically and unequivocally ordered to reunite them.

---

[8] 310 F.Supp.3d 1133, 1149 (S.D.Cal. 2018).
[9] *Id.* at 1143.
[10] *Id.* at 1147.
[11] *Id.*
[12] *Id.* at 1149.

## GEO'S UNLAWFUL TREATMENT OF PLAINTIFF FATHERS

27.     Following their initial separation upon entry to the United States, each of the FATHERS and CHILDREN were reunited and detained at the Karnes Detention Center pursuant to the orders in *Ms. L.*

28.     Upon information and belief, GEO and its staff knew or should have known that the FATHERS and CHILDREN were already suffering from distress and anxiety when they arrived at the Karnes Detention Center because they had been separated from one another for long periods of time. They also knew or should have known that these families were particularly vulnerable to additional harm, anxiety, and distress caused by being separated again and that another separation would cause more significant psychological and emotional damage.

29.     Upon information and belief, on August 15, 2018, with no prior notice or lawful justification, GEO directed, arranged, and/or permitted scores of armed personnel using bulletproof vests, shields, kneepads, boots, helmets, tear gas equipment, and guns to apprehend the FATHERS from their rooms in the Karnes Detention Center, handcuff them, and forcefully remove them from their rooms at the Karnes facility. When removing the FATHERS from their rooms at the Karnes Detention Center, the armed personnel pointed rifles and pistols at them, unnecessarily causing them to fear for their lives. The armed personnel were so forceful in removing FATHERS from their rooms that multiple FATHERS' shoes were knocked off.

30.     Upon information and belief, as they were being handcuffed, some of which restricted their blood circulation and caused them significant pain on their wrists, several of the FATHERS were crying and repeatedly asking GEO's staff what would happen to their CHILDREN. GEO repeatedly refused to tell the FATHERS where they were being taken, why GEO was again separating them from their CHILDREN, whether the CHILDREN would remain

in the Karnes Detention Center, or whether their CHILDREN were safe.  GEO's staff also deliberately and callously exacerbated their anxiety, distress, and anguish by telling them that they would never see their CHILDREN again because they would be deported while their CHILDREN would be adopted by families living in the United States. Other members of GEO's staff simply ignored the FATHERS' pleas for information. Because of GEO's intentionally malicious actions, the FATHERS did not know where their CHILDREN were, what would happen to their CHILDREN, or whether anyone was caring for them while they were separated. GEO packed all of the FATHERS' belongings for removal from the Karnes Detention Center. Between 1:00 P.M. and 5:00 P.M. the FATHERS asked GEO for basic necessities, such as water, but GEO refused to give them any.

31.     Upon information and belief, that same day, GEO removed the FATHERS without their CHILDREN from the Karnes Detention Center and directed that they be transported with all their belongings to the Pearsall Detention Center, which was approximately two hours away. The FATHERS cried throughout the two-hour bus ride. At all relevant times GEO operated the Pearsall Detention Center.

32.     Upon information and belief, when they arrived at the Pearsall Detention Center GEO removed the FATHERS from the bus. GEO formally processed the FATHERS through intake procedures at the Pearsall Detention Center, giving the FATHERS uniforms, handbooks with rules for the facility, and identification bracelets that had their names, birthdates, and other information on them. All these circumstances led the FATHERS to reasonably believe that they would be indefinitely detained there alone and, as GEO staff had already told them, that they would never see their CHILDREN again.

33.     Upon information and belief, once the FATHERS finished the intake process at

the Pearsall Detention Center, GEO staff imprisoned them in solitary confinement, which prevented the FATHERS from communicating with one another.  Some arrived in their individual cells as late as 2:00 A.M. The FATHERS were placed in isolation so that they could not speak with one another. The cells contained only dirty mattresses, toilets, and sinks. They smelled terrible and were highly insanitary. The water from the sinks was very murky and unclean, and the food was cold and nearly inedible.

34.     Upon information and belief, during their imprisonment at the Pearsall Detention Center, several FATHERS again repeatedly asked GEO for information about their CHILDREN, where their CHILDREN were, and whether they were safe.  GEO refused to give the FATHERS any information about their CHILDREN (who were as young as six years old), whether their CHILDREN had been transferred from the Karnes Detention Center to another facility as the FATHERS had been, who was responsible for their custody and care, or whether they were safe.

35.     Upon information and belief, GEO's cruel, callous, and intentional mistreatment caused the FATHERS to become extremely distressed and frightened for their own and their CHILDREN's safety and well-being.  They could not stop crying.  The FATHERS suffered great distress and anguish from their worries that they would never see their sons again, as GEO staff had told them. The FATHERS could not eat or sleep while at the Pearsall Detention Center, or had severe difficulty doing so. Several FATHERS screamed and cried loudly for their CHILDREN. Others vomited blood and shook uncontrollably. Because GEO told the FATHERS that they would never see their sons again, and all of the circumstances appeared to confirm this, one FATHER attempted suicide.

36.     Upon information and belief, late in the evening of Thursday, August 16, 2018, GEO ordered the FATHERS onto a bus and returned them to the Karnes Detention Center. This

transfer caused further anguish to the FATHERS. GEO threatened the FATHERS that if they did not "behave," they would be re-separated from their CHILDREN again. The FATHERS arrived at the Karnes Detention Center that night. They were not offered dinner. The FATHERS were eventually reunited with their CHILDREN, after having been forced apart again.

37.     Upon information and belief, FATHERS were issued new Karnes Detention Center identification cards listing their entry date to the Karnes Detention Center as August 15, 2018, or August 16, 2018.

### GEO'S UNLAWFUL MISTREATMENT OF PLAINTIFF CHILDREN

38.     Upon information and belief, GEO's actions likewise inflicted severe emotional trauma and distress on the CHILDREN. On August 15, 2018, several of the CHILDREN saw their handcuffed FATHERS forcibly removed by scores of armed men using bulletproof vests, shields, knee pads, boots, helmets, tear gas equipment, and guns pointed at their FATHERS. Some of the CHILDREN were as young as six (6) years old.

39.     Upon information and belief, after GEO restrained the FATHERS, forcibly removed them from the Karnes Detention Center, and transferred them to the Pearsall Detention Center, the CHILDREN were isolated from the other children at the Karnes Detention Center and placed in one room. GEO told the CHILDREN that they were going to be re-separated from their FATHERS. The CHILDREN cried and suffered severe emotional distress and anguish.

40.     Upon information and belief, GEO staff packed all the CHILDREN's clothes and belongings that were stored in their rooms at the Karnes Detention Center and told the CHILDREN that they were going to be transferred to a shelter. Later that night the CHILDREN were moved to a medical center at the Karnes Detention Center and their belongings were placed on carts. The CHILDREN were crying and several asked to speak with their lawyers from

RAICES, but GEO staff denied their requests or refused to respond. GEO detained the CHILDREN in isolation in the medical center all night. At least one child hid under his bed in the isolation room out of fear, and at least another considered committing suicide.

41.     Upon information and belief, still refusing to provide any information about the whereabouts or well-being of their FATHERS, at one point during their segregated detention GEO brought the GEO chaplain to pray with and comfort the CHILDREN, as would be done had their FATHERS died or been seriously injured. This heightened the fear and anxiety of the CHILDREN.

42.     Upon information and belief, the next day, August 16, 2018, GEO continued to isolate the CHILDREN from the other families detained at the Karnes Detention Center. GEO told them that they would remain separated from their FATHERS. Some CHILDREN overheard a woman say that their FATHERS would never return to the Karnes Detention Center. The GEO staff who oversaw the CHILDREN during the morning of August 16, 2018, mocked them by saying, "***Don't worry, your fathers are in jail***."

43.     Upon information and belief, upon the FATHERS' return to the Karnes Detention Center, CHILDREN were issued new Karnes Detention Center identification cards listing their arrival date at the Karnes Detention Center as August 15, 2018, or August 16, 2018, even though none of the CHILDREN were removed from the Karnes Detention Center. For some CHILDREN the arrival date on their new identification card does not match the arrival date on their respective FATHER's new identification card.

## THE SEVERE AND ONGOING EMOTIONAL DISTRESS INTENTIONALLY INFLICTED BY GEO

44.     Experts in child welfare, juvenile justice, and child development, including the American Association of Pediatrics, have concluded that: "[T]he psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation—even after the eventual reunification with a parent or other family."[13] The American Academy of Child and Adolescent Psychiatry concurred: "When children experience sudden separation from one or both parents, they are at heightened risk for developing posttraumatic stress disorder (PTSD), anxiety, depression, and other trauma-related reactions that may last for the rest of their lives. This is especially the case for children who are fleeing war, violence, or other traumatic situations in their home countries."[14] Other expert medical organizations have agreed that family members who are separated from one another suffer severe distress and trauma, and harmful effects to their health:

> [c]hildren depend on their parents for safety and support. Any forced separation is highly stressful for children and can cause lifelong trauma, as well as an increased risk of other mental illnesses, such as depression, anxiety and posttraumatic stress disorder (PTSD). The evidence is clear that this level of trauma results in serious medical and health consequences for these children and their caregivers.[15]

45.     The Director of Harvard University's Center on the Developing Child noted:

> Sudden, forcible separation of children from their parents is deeply traumatic for both. Above and beyond the visible distress 'on the outside,' this overwhelming

---

[13] Letter from Children's Defense Fund on behalf of multiple organizations to the Secretary of the U.S. Department of Homeland Security, January 23, 2018, available at: https://www.womensrefugeecommission.org/images/zdocs/2018-01-23-Child-Welfare-Juvenile-Justice-Opposition-to-Parent-Child-Separation-FINAL-CDF.PDF.

[14] AACAP Releases Policy Statement on Separating Immigrant Children from Their Families, June 26, 2018.

[15] American Psychiatric Association, Statement Opposing Separation of Children From Parents at Border, May 30, 2018.  https://www.psychiatry.org/newsroom/news-releases/apa-statement-opposing-separation-of-children-from-parents-at-the-border

experience triggers a massive biological stress response *inside* the child, which remains activated until that familiar caregiver returns. Even more important, continuing separation removes the most important resource a child can possibly have to buffer the effects of toxic stress—a responsive adult who's totally devoted to that child's well-being. Stated simply, each day we fail to return these children to their parents, we compound the harm and increase its lifelong consequences.[16]

46.     The Society of Behavioral Medicine added:

Children are particularly vulnerable to adverse and traumatic experiences. Forced separation from their most trusted caregivers exposes children to extreme stress that can severely compromise their health and well-being for the rest of their lives. Children who experience extreme stress are at increased risk of neurological damage, developmental delays, depression, anxiety, drug abuse, and suicidality in the short-term; as adults, they are at increased risk of cardiovascular disease, cancer, depression, drug abuse, suicidality, and an estimated 20-year reduction in life expectancy.[17]

47.     Media reports have explained that "many of the children released to their parents [after a separation from one another] are exhibiting signs of anxiety, introversion, regression and other mental health issues."[18] These signs include "acute anxiety around routines that separate [the children] from their parents, such as when the adult bathes or goes into another room." *Id.* The reports add that "[d]ecades of research have concluded that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma." *Id.* "More recent studies have found that separation can impair memory and normal production of cortisol, a hormone produced in response to stress." *Id.* This

---

[16] Statement on Separation of Families,  Jack P. Shonkoff, M.D., Director of the Center on the Developing Child, Harvard University, June 20, 2018.
https://developingchild.harvard.edu/about/press/shonkoff-statement-separating-families.
[17] The Society of Behavioral Medicine Opposes the Forced Separation of Migrant Children from their Families, June 2018.
https://www.sbm.org/UserFiles/file/SBMStatementOpposingSeparationofImmigrantChildrenfromParents.pdf
[18] M. Jordan, A Migrant Boy Rejoins His Mother, But He's Not the Same, N.Y. Times, July 31, 2018, available at https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html.

psychological harm continues even after reunification.

48.     Consistent with these expert conclusions and media reports, GEO's intentional actions and omissions detailed above caused the CHILDREN and the FATHERS to suffer—and will cause them to suffer in the future—immediate and acute psychological injury as well as permanent emotional and psychological harm. These injuries include anxiety, anguish, depression, PTSD, toxic stress, and other trauma-related disorders. The trauma that the CHILDREN suffered and will continue to suffer has been further exacerbated by watching their FATHERS suffer and by the emotional impact of the FATHERS' trauma on the parent-child relationship.

49.     Besides being deprived of their CHILDREN's place in their lives, the FATHERS were also deprived of the self-respect and sense of personal agency that such paternal function provides. Said deprivation of parental authority will continue to affect the parent-child relationship presently and in the future. The FATHERS became hypervigilant and distrustful and developed a lack of interest in recreation. Even after the FATHERS and their CHILDREN were reunited following the FATHERS' return from the Pearsall Detention Center, they still could not sleep or had great difficulty doing so because they were worried that they would be separated again. Several of the FATHERS and CHILDREN had and continue to have recurrent nightmares in which they cry out for one another and check in the middle of the night to see whether they have been separated again. One child was crying for days after reunification and blamed his father for leaving him alone at the Karnes Detention Center.

50.     In undertaking the actions detailed above, GEO exceeded its authority (if any) that it received from any governmental entity. Additionally, any governmental entity that may have directed GEO to undertake its actions detailed above lacked proper authorization to do so,

such that that authorization was invalid and without any lawful basis.

**COUNT I -- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

51.    The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

52.    GEO intentionally took its actions detailed above.

53.    GEO's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and is atrocious and utterly intolerable in a civilized community.

54.    As a result of GEO's actions, Plaintiffs have suffered and will continue to suffer severe emotional distress, trauma, and anguish.

**COUNT II -- INFLICTION OF EMOTIONAL DISTRESS ON A BYSTANDER**

55.    The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

56.    The CHILDREN, who at the time of the re-separation were minors in the custody and under the control of GEO as detainees at the Karnes Detention Center, witnessed the traumatic removal of their handcuffed FATHERS while being told by GEO that they would never see their parents again. These facts constitute reckless and/or negligent infliction of emotional distress against the CHILDREN as bystanders harmed by traumatic events they witnessed. The CHILDREN were located near the scene of the incident because they witnessed the forcible taking away of their FATHERS in handcuffs from the close range of a few feet to a few dozen yards. The shock from witnessing this event caused a direct emotional impact on the CHILDREN due to its sensory and contemporaneous nature. And the CHILDREN were the sons of the FATHERS and thus closely related to the victims of the initial abuse.

57.     Moreover, as concerns the FATHERS, the mental anguish suffered from the second separation, given the known vulnerable condition of the FATHERS as well as the even more significant vulnerability of the CHILDREN, is of a 'shocking and disturbing nature' so as to make it a highly foreseeable result that they would suffer mental anguish.

## COUNT III – FALSE IMPRISONMENT

58.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

59.     The FATHERS were forcibly removed from the Karnes Detention Center on August 15, 2018, despite their objections and thereby separated from their CHILDREN without a legal reason.

60.     This separation was effectuated by the handcuffing, forcible removal, and full control of the FATHERS in Karnes Detention Center, in transit, and in the Pearsall Detention Center.

61.     While GEO was detaining the FATHERS in the Karnes Detention Center under color of law, they had no authority to remove them to the Pearsall Detention Center and in fact acted in a manner inconsistent with a federal court's order that forbids separating parents from their children.

62.     The CHILDREN were forced to remain together in the medical unit at Karnes Detention Center, isolated from all other children. The CHILDREN were not permitted to leave the medical unit, denied access to their attorneys, and refused any information regarding their FATHERS, despite multiple requests.

63.     The separation of the FATHERS from their CHILDREN constitutes false imprisonment.

## COUNT IV – ASSAULT AND BATTERY

64.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

65.     GEO participated in the threat or use of force against the FATHERS, the tight handcuffing of the FATHERS, and the forcing of the FATHERS to be transported to another detention center in an effort to intimidate, insult, and degrade the FATHERS. The actions of GEO caused severe mental distress, and in some cases physical injury, to some FATHERS.

## COUNT V – MEDICAL MALPRACTICE AND FAILURE TO PROVIDE ADEQUATE MEDICAL CARE

66.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

67.     Both the CHILDREN and FATHERS were subjected to detention without proper medical care and/or to abuses by medical personnel that constituted the malpractice of medicine and medical care. Several Plaintiffs have been diagnosed with Post-Traumatic Stress Disorder, a disorder for which they should have received adequate medical, psychological, and/or psychiatric care. Instead, GEO employed inadequate staff; provided care that failed to meet an adequate professional standard of care, including, based on information and belief, subjecting the CHILDREN to abuse that amounted to child abuse; and failed to report child abuse, as required by law, to which these Plaintiffs had been subjected in their presence.

68.     These actions constitute the torts of malpractice of medicine and failure to provide adequate medical care.

**COUNT VI – NEGLIGENCE PER SE FOR FAILURE TO REPORT CHILD ABUSE**

69.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

70.     GEO was negligent in its failure to report child abuse that was observed or should have been observed in its function as custodian of the CHILDREN, abuse in which it played a role, and because GEO had a special relationship of being professional caregivers or even medical or psychological treatment providers to the CHILDREN.

**COUNT VII – VIOLATION OF POSSESSORY RIGHT TO CHILDREN, TEXAS**

**FAMILY CODE SECTIONS 42.002 (ON BEHALF OF PLAINTIFF FATHERS)**

71.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

72.     The United States District Court for the Southern District of California's Order in *Ms. L* that directed that the CHILDREN be reunified with their FATHERS is an Order under Texas Family Code ("TFC") Section 42.001. That Order gave the FATHERS a possessory right to their CHILDREN under TFC Section 42.001.

73.     At all relevant times the FATHERS were not unfit to be parents, did not present a danger to the CHILDREN, and did not decline to be united with their CHILDREN.

74.     When GEO took each of the actions above, it had actual notice of the existence and contents of the Order in *Ms. L*.

75.     GEO had reasonable cause to believe that their actions were likely to violate the Preliminary Injunction, as the CHILDREN were among the subjects of the Preliminary Injunction.

76.     Notwithstanding the Preliminary Injunction, GEO took or retained possession of

the CHILDREN from their FATHERS and concealed the CHILDREN'S whereabouts from the FATHERS when the FATHERS were entitled to possession and/or access to the CHILDREN according to the FATHER'S possessory rights.  GEO acted with malice and with an intent to harm both the FATHERS and the CHILDREN.

77.     As a result of GEO's actions and violations of the Court's Order in the *Ms. L* case, Plaintiffs have suffered and will continue to suffer damages, including severe trauma, anguish and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.     An award to Plaintiffs of compensatory damages, including but not limited to damages for emotional distress, psychological trauma, and mental anguish;

B.     An Order requiring GEO to establish a fund in an amount to be determined at trial for the current and future mental health assessments, treatments, counseling, and ongoing mental health monitoring of Plaintiffs, including but not limited to physical manifestations of trauma;

C.     An award to Plaintiffs of exemplary/punitive damages;

D.     An award to Plaintiffs of their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs, as provided by law;

E.     Pre-judgment and post-judgment interest, as provided by law; and

F.     Granting Plaintiffs other and further relief as this Court finds necessary and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by this Complaint.

Dated: May 23, 2019

Respectfully submitted,

*/s/ Jule Rousseau*

Jule Rousseau, Esq. (motion for *pro hac vice* admission to be filed)
ARENT FOX LLP
1301 Avenue of the Americas, Floor 42
New York, NY 10019
(P) 212-484-3900
(F) 212-484-3990
jule.rousseau@arentfox.com

Brandi G. M. Howard, Esq.
Texas State Bar No. 24085386
ARENT FOX LLP
1717 K Street N.W.
Washington, D.C. 20006
(P) (202) 857-6000
(F) (202) 857-6395
brandi.howard@arentfox.com

Ismael Bautista, Esq. (motion for *pro hac vice* admission to be filed)
Jacob M. Gilbert, Esq. (motion for *pro hac vice* admission to be filed)
ARENT FOX LLP
555 West Fifth Street, 48th Floor
Los Angeles , CA 90013 USA
(P) 213-629-7400
(F) 213-629-7401
ismael.bautista@arentfox.com
jake.gilbert@arentfox.com

Manoj Govindaiah
Texas State Bar No. 24094384
Curtis FJ Doebbler
Texas State Bar No. 24105187
Refugee and Immigrant Center for
Education and Legal Services (RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
(P) 210-226-7722
(F) 210-212-4856
manoj.govindaiah@raicestexas.org
curtis.doebbler@raicestexas.org

Bridget Cambria, Esq. (motion for *pro hac vice* admission to be filed)
Karen Hoffmann, Esq. (motion for *pro hac vice* admission to be filed)
Aldea – The People's Justice Center
532 Walnut Street
Reading, PA 19601
(P) 484-926-2014
(F) 484-926-2032
bridget@aldeapjc.org
karen@aldeapjc.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

### Complaint & Demand for Jury Trial & Waiver of Service

I, Curtis Doebbler, attorney for the Plaintiff, do hereby certify that on 23 May 2019, I mailed

to the corporate Defendant, The GEO Group's Attorney, the **Complaint & Demand for**

**Jury Trial & Waiver of Service** by certified post to the following address:

The GEO Group, Inc.
c/o Corporate Creations Network
2425 West Loop South, Suite 200
Houston, TX 77027

Dated: May 23, 2019                _____/s/ Curtis Doebbler_____.
                                              Curtis Doebbler
                                              Attorney for the Plaintiff