IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| VICTOR MEJIA RIOS, INDIVIDUALLY AND AS NEXT FRIEND W.D.M.R | § § § | |
| *Plaintiffs*, | § § | 5-19-CV-00552-RBF |
| vs. | § § | |
| THE GEO GROUP, INC., | § § § | |
| *Defendant*. | § § § § | |

**ORDER**

In this diversity case applying Texas law, Plaintiffs are 13 fathers and 13 children detained by U.S. Immigration and Customs Enforcement (ICE) at facilities operated by Defendant The GEO Group, Inc. (GEO), a private entity. The fathers and children suffered emotional and psychological injuries, Plaintiffs allege, because GEO on August 15-16, 2018, tortiously separated the fathers from their minor children during their detention at a GEO-run facility in Karnes County, Texas. Plaintiffs' Amended Complaint raises state-law claims seeking money damages for the emotional and psychological injuries allegedly caused by GEO's actions. *See* Dkt. No. 35 (Order on Motion to Dismiss). The case was assigned for disposition following all parties' consent to proceed before a magistrate judge. *See* Dkt. Nos. 14, 16 & 17; *see also* 28 U.S.C. § 636(c).

In a previously issued Order on GEO's Motion to Dismiss, the Court granted limited discovery for the purpose of developing the factual underpinning for GEO's defenses,[1] including

---

[1] A similar approach has been taken by other courts. *See Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172, 175 (5th Cir. 2021) ("The [trial] court denied Couvillion's Motion to Dismiss and

GEO's assertion of derivative immunity under cases like *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), and a related argument that Plaintiffs' state-law tort claims are preempted under *Boyle v. United Technology Corp.*, 487 U.S. 500 (1988), and its progeny. *Id.* To the Court's knowledge, no Court has enforced *Yearsley* immunity or *Boyle* preemption for state-law tort claims lodged against a privately run immigration-detention facility. *Cf. Minneci v. Pollard*, 565 U.S. 118, 120 (2012) (declining to recognize a *Bivens* action against employees of a privately run federal detention facility because "state tort law authorizes adequate alternative damages actions . . . that provide both significant deterrence and compensation").

Presently before the Court is Defendant GEO's Motion for Summary Judgment that again raises these same defenses, now with the benefit of limited discovery. *See* Dkt. No. 44.[2] The Motion, Dkt. No. 44, is **DENIED WITHOUT PREJUDICE**. As discussed further below, clearer briefing would be needed and difficulties with the record eliminated, among other things, before the Court could grant summary judgment—either in full or in part. On the present record and briefing, GEO has not carried its summary judgment burden.

---

ordered limited discovery on the jurisdictional issue."); *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) ("At this point in litigation, the record does not contain enough evidence to determine whether KBR acted in conformity with . . . its . . . orders . . . . We also lack evidence regarding whether the military permitted or required KBR to deviate from the contract's terms under certain circumstances."); *Nwauzor v. GEO Grp., Inc.*, No. 3:17-cv-05769-RJB, 2018 WL 4150909, *1 (W.D. Wash. 2018) ("Resolving these issues, at least at this stage, appears to be intertwined with the merits of the case . . . . On the issue of whether dismissal is warranted on grounds of derivative sovereign immunity under *Yearsley*, Defendant's motion should be denied without prejudice.").

[2] Plaintiffs' Response, Dkt. No. 49, GEO's Reply, Dkt. No. 51, GEO's supplemental evidence, Dkt. No. 53, Plaintiffs' Objections to that supplemental evidence, Dkt. No. 55, GEO's Response to the Objections, Dkt. No. 56, and Plaintiffs' Reply in support of the Objections, Dkt. No. 57, are also under consideration.

**Discussion**

For *Yearsley* immunity[3] and *Boyle* preemption,[4] it is essential that the Court understand the nature of the government contractor's relationship with the federal government. Here, however, GEO contracted with Karnes, which in turn contracted with ICE, making GEO a government *sub*contractor. The significance of GEO's status as a subcontractor—as opposed to a contractor in direct privity with the government—is largely unbriefed.[5] The lack of briefing on that topic is attributable in no small part to GEO, as explained further below, and points to a larger issue counseling against a grant of summary judgment at this time.

GEO didn't produce its contract with Karnes County until it filed its Reply in Support of Summary Judgment. *See* Dkt. Nos. 52-1, 53. Plaintiffs objected to the late production of this contract, among other things, pointing out that many of their arguments in response to the summary judgment motion rely on the lack of any contract between GEO and ICE or evidence of

---

[3] The Fifth Circuit's *Yearsley* affirmative defense has the following two prongs: (1) the contractor's actions were authorized and directed by the Government (often a federal agency); and (2) the authority to undertake the actions was validly conferred. *Taylor Energy*, 3 F.4th at 175. To prevail on the defense at this stage of the proceedings, GEO must show that when viewing the record in a light favorable to Plaintiffs there are "no material factual disputes about whether" ICE authorized and directed GEO's actions or whether authority to undertake the actions was validly conferred. *Id.*

[4] To establish entitlement to *Boyle* preemption, a defendant typically must show that: (1) the government approved reasonably precise specifications; (2) the equipment or work conformed to the specifications; and (3) the contractor warned the government about any dangers that were known to the contractor but not to the government. *E.g.*, *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 460 (5th Cir. 2010) (citing *Boyle*, 487 U.S. at 512).

[5] Based on the Court's preliminary independent research, this issue appears to be potentially more relevant under *Yearsley* and less so under *Boyle*. *Cf. Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168-69 (2016), as revised (Feb. 9, 2016) (noting lack of contractual privity and the fact that it didn't advance an argument for derivative immunity where a contractor was sued for a subcontractor's actions).

some other reason compelling GEO to follow ICE's instructions.[6] Granting Plaintiffs' objections and precluding GEO from introducing the contract and other matters wouldn't be ideal, however, because there has only been limited discovery so far; GEO presumably might produce the contract and other matters and re-urge its arguments once discovery re-opens. Yet Plaintiffs are correct in that they have been prejudiced by losing an opportunity to argue against *Yearsley* immunity and *Boyle* preemption based on a full understanding of, and record reflecting, the actual relationship between GEO and ICE. As it is GEO's burden to show entitlement to its affirmative defenses, GEO's request for summary judgment must be denied now without prejudice due to these issues.

Other issues also counsel against a grant of summary judgment at this time, even if the Court were inclined to look the other way on GEO's prejudicial late production.

**A.      ICE and GEO's Relationship as It Relates to Plaintiffs' Claims Is Still Not Clear.**

Plaintiffs have clarified and refined their claims to make clear that they do not challenge ICE's general authority to transfer detainees but instead challenge GEO's allegedly tortious conduct in effecting the transfers. Indeed, as GEO notes, without this concession Plaintiffs' claims would be far more susceptible to dismissal under *Yearsley* or *Boyle* and would more fairly be characterized as taking issue with the ICE policy of separation itself. Mot. at 16 ("As part of their strategy to avoid dismissal, Plaintiffs disclaimed any reliance on the transfer itself to

---

[6] *See* Dkt. No. 55 at 4 ("Plaintiffs crafted legal and factual arguments in response to Defendant's Motion for Summary Judgment based on the evidence Defendant presented in discovery and in its Appendix. Specifically, and as reflected in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, GEO had produced no evidence establishing contractual privity between GEO and ICE. Indeed, the sixteen excerpted pages of the IGSA previously provided by GEO mention no subcontract. Plaintiffs would have constructed a different reply to Defendant's Motion for Summary Judgment had they seen the newly disclosed portions of the IGSA that reference subcontractors and the Services Agreement Amendment No. 1.").

support their state law claims."). Yet much of the briefing focuses on ICE policies addressing whether these detainee transfers were authorized. To be fair, this discussion might be motivated by competing positions on whether authority to undertake the actions on August 15-16, 2018, was validly conferred, which is a consideration under *Yearsley*. But if that topic is the target, the briefing seems to miss the mark. The relevant question would not, it would seem, be whether transferring the detainee fathers at all violated a law or court order but rather whether Congress had the authority to allow ICE to assign GEO to complete that task. *See Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009). The upshot for present purposes, in any event, is that the briefing doesn't sufficiently focus on whether or not ICE directed the manner of separation or how precisely to perform each separation, which appears the more pertinent issue based on Plaintiffs' refinement of their case.

        1.     *Plaintiff's claims involve the manner of separation, not the decision to separate*. Plaintiffs allege that their injuries stem from the tortious manner by which GEO separated the Plaintiff fathers from their children. At the same time, Plaintiffs disclaim reliance on GEO's mere implementation of an ICE policy of separation as causing Plaintiffs' injuries. Plaintiffs clarified their litigation theory in open court[7] as well as in their Amended Complaint.[8] Accordingly, it is Plaintiffs' theory that GEO could have separated the fathers and their children in a non-tortious manner but instead did so tortiously, and it is for the resulting emotional and psychological harms that Plaintiffs seek redress via this action. *Id.*; *see also* Dkt. No. 25 at 9:17-10:5, 10:21-11:7 (counsel for Plaintiffs stating, among other things, "We believe that . . . if information had been provided to [Plaintiffs] during the course of the separation . . . we could

---

[7] *See* Dkt. No. 25 (Transcript of Nov. 21, 2019, Pretrial Hearing) at 7:1-8, 8:1-6 (emphasis added); *see also id.* 9:17-10:5, 15:6-16:5; Dkt. No. 35 at 1.

[8] Dkt. No. 27 (Am. Compl.) ¶¶ 44-50, 54, 59, 78-79, 86, 93.

have avoided this [*i.e.*, the injuries to Plaintiffs]"), *id.* 15:6-16:5. To the extent any of Plaintiffs' claims, as pleaded, can no longer be squared with this refined theory of the case, those claims would be subject to dismissal.

Plaintiffs' Response in Opposition to the Motion for Summary Judgment further confirms Plaintiffs' litigation theory. Plaintiffs confirm that they "are not disputing ICE's general authority to transfer asylum seekers" but instead are "alleging GEO undertook specific tortious conduct during its separation of Plaintiff families." Resp. at 16. Later, Plaintiffs clarify that they "do not challenge ICE's zero tolerance policy" but rather "seek to hold [GEO] responsible for harms incurred as a result of Defendant's gross misconduct in effectuating the separation and transfers that occurred on August 15 and 16, 2018." *Id.* at 17. Accordingly, GEO's briefing regarding ICE policies that addresses whether these detainee transfers were authorized does not materially assist its efforts to obtain summary judgment.

   **2.** *The Full Picture of the GEO-Ice Relationship Is Still Unclear.* As mentioned, GEO operates Karnes pursuant to a subcontract—called Services Agreement Amendment No. 1—between GEO and Karnes County (not ICE). That subcontract, according to GEO, incorporates an Intergovernmental Service Agreement (IGSA) between Karnes and ICE. "GEO [ ] provided the quality control plan included in the IGSA," and GEO's contract with Karnes County requires GEO to comply with the IGSA. GEO Repl. at 2 (citing Ex. 46 to Mot. for Summ. J., which is located at Dkt. No. 53). But even the IGSA apparently doesn't provide the full story on how things work at Karnes.

There are also policies in place that govern operations at Karnes. At least some of Karnes's policies were originally based on ICE's Performance Based National Detention Standards but were apparently later amended to follow ICE's Family Residential Standards. Ex.

1 to Mot. for Summ. J. (Statement of Facts) at 2. It is unclear from the present record what version of ICE's Family Residential Standards was in effect on the dates in question, although it was presumably the 2007 version. *See* Family Residential Standards 2020, at https://www.ice.gov/detain/detention-management/family-residential (Sep. 27, 2021). It is also unclear under what authority these amendments were undertaken. In any event, according to the deposition of Karnes Facility Administrator Rose Thompson, the Karnes County Residential Center Policies and Procedures Manual is the product of the conversion of the 2008 Performance Based National Detention Standards "to the family standards in terms of the Karnes policy." Thompson Dep. 33:16-20.  After lengthy review of the briefing and record, it remains unclear to the Court how exactly the IGSA relates to not only the Karnes County Residential Center Policies and Procedures Manual but also to the 2008 Performance Based National Detention Standards and the Family Residential Standards. Often in its briefing, GEO cites the IGSA as providing the governing standards for operations at Karnes, *E.g.*, Ex. 1 to Mot. for Summ. J. (Statement of Facts) at 1, 2; Mot. for Summ. J. at 5, 7, 10, even as it elsewhere invokes generically some "ICE-approved policy" or "policies" *id.*, at 2, 3, 8 (referring to "ICE-approved Karnes policies" in the plural), 13 (similar), 15 (similar); Mot. for Summ. J. at 4, 5, 8, 10, 12, 13, 16, 20 (similar), or refers to the seemingly more tailored Karnes County Residential Center Policies and Procedures Manual. Further muddling matters are references to Karnes's emergency plan. *See e.g.*, Ex. 1 to Mot. for Summ. J. (Statement of Facts) at 2, 5; *but see* Thompson Depo. 31:13-20 (referring to the emergency plan in the Family Residential Standards).

GEO explains broadly that the relevant "[p]olicies at Karnes are developed with, and approved by, ICE." Ex. A to Mot. for Summ. J. (Statement of Facts) at 2. In support, GEO points out that certain policies governing GEO's operations at Karnes are signed by GEO and by ICE.

GEO Repl. at 3 (citing GEO_000128, 161, 183, 225). But ICE's mere signature on a policy, without more, is likely insufficient under both *Yearsley* and *Boyle* to show that ICE actually approved the polices.[9] And nowhere in GEO's briefing does it explain what the ICE approval process looked like or involved.

The Fifth Circuit instructs that for actions to be authorized and directed by the Government, "[t]he appropriate inquiry [under *Yearsley*] is whether [the government contractor] adhered to the Government's instructions as described in the contract documents." *Taylor Energy*, 3 F.4th at 176. Cases invoking *Boyle*, often but not always in a procurement-contract setting, refer to the need for government-approved "reasonably precise specifications." *E.g.*, *In re Katrina Canal*, 620 F.3d at 460 (citing *Boyle*, 487 U.S. at 512). Where discretion to the contractor is delegated, "mere government acceptance of the contractor's work does not resuscitate the defense unless there is approval based on substantive review and evaluation of the contractor's design choices." *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 335 (5th Cir. 1991) (quotations omitted). The Fifth Circuit has advised that a defense under *Boyle* is not intended to permit the "government [to] provide general specifications, inform the court that it 'precisely' chose to approve only general specifications, and thus render all subsequent, discretionary decisions of a government contractor protected." *In re Katrina Canal*, 620 F.3d at 465. Moreover, "the requirement of reasonably precise specifications must be met by the specific feature at issue in the claim[s]." *Id.* Here, the specific feature of this relationship might be the manner by which GEO separated the plaintiff children and fathers, which begs the question

---

[9] *See, e.g.*, *Taylor*, 3 F.4th at 176; *McAllister v. McDermott, Inc.*, No. CV 18-361-SDD-RLB, 2020 WL 4745743, at *13 (M.D. La. Aug. 14, 2020); *Miceli v. Donjon Marine, Inc.,* No. CIV.A. 06-5442, 2008 WL 1834582, at *3 (E.D. La. Apr. 23, 2008).

concerning whether and to what extent the various contracts, policies, and standards addressed the manner by which detainee children could or would be separated from their parents.[10]

GEO's motion rests largely on ICE's involvement in directing the separation both on the ground on the date in question, as well as through the establishment of various policies governing GEO's activities at Karnes. ICE's precise role in the physical separation of each of the individual plaintiffs from their children (as opposed to the separation decision itself) is far from clear in the briefing submitted. Matters become even muddier when trying to piece together which contracts, standards, and policies applied, as well as how they were developed and approved by ICE. To prevail in whole or part on its defenses, GEO, at a minimum, needs to clearly explain which contracts, standards, and policies were in place and governed during the

_____

[10] Or a different reading of the *Boyle* cases could be at issue, under which it is government discretionary functions performed by contractors that are afforded protection by *Boyle*. *See* Mot. for Summ. J. at 19-20. But how this alternative reading of *Boyle* and its progeny would relate to the facts presented isn't meaningfully addressed in the present briefing, which focuses on the fact of separation, or the decision to separate, and not the manner of separation. Even assuming for argument's sake that deciding to separate was a discretionary ICE decision, what does that mean for the manner of the separation? Would a private contractor whose employees violently separated families at 2:00 a.m. with guns, tear gas, and excessive force be immunized from tort claims? Would it matter if ICE mandated—or approved and knew—that was how the separation would be accomplished?

In *Brown v. Nationsbank Corp.*, 188 F. 3d 579 (5th Cir. 1999), cited by GEO, the Court recognized *Boyle* preemption of state tort claims against private defendants who assisted federal agents in a federal sting operation. *Id.* at 585, 588-89. It doesn't appear that any contract governed the relationship between the defendants and the federal government, and the case didn't involve the procurement of military equipment. The Court nevertheless noted that "[i]f the private defendants committed what would have been illegal acts under state law at the direction and control of [federal law enforcement] agents acting within their authority, the operation of state law would conflict with federal policy" and state law claims would be preempted. *Id.* at 589. The Court further noted—in a motion to dismiss posture in which the truth of the plaintiffs' allegations in the complaint must be assumed—that "the private defendants, in good faith, supported the FBI's undercover operation," there was "no suggestion that the private defendants acted maliciously," the private defendants' actions were "objectively reasonable," and those defendants "had no reason to believe that their actions were illegal or would cause injury to the" plaintiffs. *Id.* at 589. *Brown*, it would seem, might provide significant support for GEO's *Boyle* defense if ICE directed the specific manner of the separation and GEO's actions, viewed in a light favorable to Plaintiffs, were objectively reasonable.

events at issue. It also needs to detail the extent of ICE's involvement in approving these contracts, standards, and policies and physically effecting each separation.

      **B.**    **The Case's Posture Counsels Against Weighing Competing Evidence or Finding Video Evidence Conclusive.**

Plaintiffs direct the Court's attention to summary judgment evidence in the limited summary judgment record supporting allegations in the live complaint that GEO "carried out its actions in excess of any possible authority it could have been granted by [ICE]." Resp to Mot. for Summ. J. at 11-12. Plaintiffs, specifically, point to evidence that GEO:

(1) painfully handcuffed Plaintiff fathers;

(2) used unnecessary force against fathers in front of their children;

(3) pointed weapons and used riot gear; and

(4) threatened Plaintiffs that they were being permanently separated from their family members.

*Id*. And in a related argument, Plaintiffs contend GEO violated governing policies in undertaking its actions because it:

(1) used force when there was no imminent threat;

(2) failed to record and follow the standard for uses of force as required by the Family Residential Standards; and

(3) disciplined detainees in front of children.

*Id*. at 13.

In reply, GEO accuses Plaintiffs of "skew[ing] the record by misrepresenting evidence" and "ignoring substantial evidence—including their own admissions—that undercuts their claims." Repl. at 2. GEO's solution appears to involve weighing competing evidence and crediting video evidence that contradicts Plaintiffs' version of events. But the case is in a summary judgment posture. Accordingly, the Court must view the summary judgment evidence

in the light most favorable to Plaintiffs. *See Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993). Moreover, a full summary judgment record is not before the Court; only limited discovery has been undertaken. As the parties' arguments begin to move into the merits of Plaintiffs' claims, and so move beyond only issues touching on GEO's defenses, the Court must proceed with caution when entertaining arguments that certain evidence is unrebutted or uncontradicted.

As to the video evidence, says GEO, it shows for example that "Plaintiffs' claims about force, weapons, and restraints are thoroughly undercut by the handheld videos and other evidence that Plaintiffs ignore—which is not legitimately disputable." Repl. at 6. With respect to Plaintiffs' allegations regarding armed guards, GEO cites videos showing the encounters between GEO personnel and Plaintiffs Martinez and Vasquez Puac. *See id*. at 8. Plaintiffs, however, cite evidence from other individual fathers regarding the use of weapons and riot gear. *See* Resp. to Mot. for Summ. J. at 12 (citing Ex. 38 to ECF 44-1 Reyes-Portillo Decl. ("I looked up and noticed a ton of officers in the hallway. At least 30. They were all wearing helmets and guns on belts around their waist. One of the guards was carrying a shotgun or something like it. It was a big, long gun. . . . My son [ ] was at school when this was happening. The school was nearby so he could see what was happening.")); Ex. 30 to ECF 44-1 Xitumul Gargia Decl. ("I'm unsure but I believe they were carrying a side arm."). As no videos concerning these plaintiffs are brought to the Court's attention, the Court cannot at this juncture and in this posture weigh the competing summary judgment evidence to preclude all Plaintiffs' claims.

## C.  Joining ICE Is Not Warranted.

Because Plaintiffs' injuries were allegedly caused by the tortious manner by which GEO separated the parents and children, and because no ICE policy governing the manner of

separation has been brought to the Court's attention, there is no reason to join ICE at this time. The injuries relate to GEO's alleged actions.

## Conclusion and Next Steps

For all these reasons, summary judgment is inappropriate on the present record and therefore the motion is denied.

It may make sense for the parties to re-brief these issues, or it may make sense to proceed with remaining discovery and a further dispositive motions deadline. Whether or not all parties agree that discovery and a further dispositive motions deadline is the best course, they should advise the Court, in a joint advisory filed within **7 days** from the date of this Order, on their views regarding next steps in this litigation. The Court will then set a Zoom video status conference.

The Court's denial here is without prejudice. GEO, if it so chooses, may file an amended summary judgment motion on its defenses that adequately addresses the issues discussed herein. Any amended motion must attach the full policies and contracts at issue. Matters may be filed under seal pursuant to the procedures outlined in the Court's Local Rules. Additionally, the parties in their briefing need not feel constrained by page limitations, as the Court will grant reasonable requests (made after conferring with opposing counsel) to exceed those limits. At the same time, briefs must cite and provide the Court with evidence and argument in a manner that focuses on ease of readability. For example:

- No separate statement of facts should be filed. A statement of facts should instead be included within the main brief.

- Incorporation by reference is discouraged. Parties are free to reproduce prior briefing if they so desire (even verbatim) but adopting it by reference makes reading a given brief more cumbersome.

- All citations should refer to the relevant exhibit number (as opposed to the document's Bates number or the party's summary of the evidence, which can be included so long as the exhibit number is also used).

- The parties must submit a USB drive to chambers that contains the brief along with all exhibits (whether sealed or unsealed) in one bookmarked pdf. Any citations in the brief must directly link the Court to the applicable exhibit(s).

A corresponding response and reply may also be filed within the appropriate time limits provided by the Rules. Reasonable extensions to deadlines to file briefs will be granted if made by motion after conferring with opposing counsel.

     **IT IS SO ORDERED**.

     SIGNED this 30th day of September, 2021.

RICHARD B.  FARRER
UNITED STATES MAGISTRATE JUDGE